# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| CAPITOL HILL GROUP, | ) | 02-bk-359 (Chapter 11) |
| | ) | |
| Debtor. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |
| | ) | |
| PILLSBURY WINTRHOP | ) | |
| SHAW PITTMAN LLP, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | 11-cv-51 (RCL) |
| | ) | |
| CAPITOL HILL GROUP, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

## I.       INTRODUCTION

We come now to the seventh year in a bitter feud between appellant Pillsbury Winthrop Shaw Pittman LLP ("Shaw Pittman")[1] and appellee Capitol Hill Group ("CHG") over attorneys' fees and services arising out of a Chapter 11 bankruptcy proceeding commenced nearly a decade ago, during which Shaw Pittman served as legal counsel to CHG.  Shortly before Shaw Pittman withdrew as counsel, the parties reached an agreement that permitted CHG to delay full payment of Shaw Pittman's fees beyond the hearing date for confirmation of CHG's reorganization plan. In exchange for this extension, CHG promised that it would not challenge Shaw Pitman's fee applications in the bankruptcy proceeding.  Despite this agreement, the matter before the Court

---

[1] At the time of its representation, Shaw Pittman had not yet merged with Pillsbury Winthrop, and was known only as Shaw Pittman.

today represents the latest skirmish in a prolonged dispute between the parties over attorneys'

fees. The fighting began when CHG, having agreed not to object to Shaw Pittman's fees, raised

objections to those fees. It continued when Shaw Pittman sought an unnecessary and overbroad

declaratory judgment. It escalated when CHG, having been warned by the bankruptcy court that

any future claims against Shaw Pittman would be barred by *res judicata*, brought new claims

outside the bankruptcy proceedings. And now Shaw Pittman—unsatisfied with only obtaining

dismissal of CHG's latest claims—seeks to extract additional fees from CHG. Having failed in

this endeavor below, Shaw Pittman appeals from entry of summary judgment in favor of CHG in

its adversary proceeding brought to collect fees the firm incurred while defending against a

malpractice suit brought against it by CHG in 2008. On appeal, Shaw Pittman argues that the

parties' original agreement extends to the claims of malpractice and requires reimbursement. For

the reasons set forth below, the Court finds that the bankruptcy court properly interpreted and

applied the agreement and therefore affirms its dismissal of the adversary proceeding.

## II.    BACKGROUND

While the parties have been engaged in protracted litigation for a number of years, to

spare the reader and in the interest of brevity, the Court here recounts only those events which

are necessary to its determination of the issues on appeal.

### A.    The Bankruptcy Proceedings

Following entry into Chapter 11 proceedings, CHG retained Shaw Pittman as counsel

pursuant to an engagement approved by the bankruptcy court. Statement of Undisputed Material

Facts ¶ 1, R. at 22, Jan. 10, 2011 [2] ("Stmt. of Facts").[2] Shaw Pittman represented CHG in

these proceedings from early 2002 until approximately January 7, 2004, when Shaw Pittman

---

[2] CHG filed a response to Shaw Pittman's statement of undisputed facts before the bankruptcy court in which it concurred with certain statements by Shaw Pittman and disputed others. Unless otherwise stated, citations to Shaw Pittman's statement are only to those facts which CHG does not contest.

withdrew as counsel. *Id.* Following nearly two years of litigation, CHG's restructuring plan was scheduled for confirmation by Judge Teel of the bankruptcy court on December 15, 2003. Stmt. of Facts ¶ 3. Pursuant to 11 U.S.C. § 1129(a)(9) of the bankruptcy code, Shaw Pittman was entitled to be paid in full for its services rendered at that time. *Id.* So begins our tale.

### 1.      The Fee Agreement and Subsequent Disputes

Prior to the deadline, CHG's new counsel exchanged a series of emails with a Shaw Pittman attorney, the substance of which would form an agreement concerning Shaw Pittman's fees (the "Fee Agreement"). In the first email, CHG offered to pay $850,000 of Shaw Pittman's outstanding fees and to provide a lien in favor of Shaw Pittman for the remaining fees, pending approval of financing for CHG's restructuring. *In re Capitol Hill Group*, 313 B.R. 344, 353 n.5 (D.D.C. 2004) ("*In re CHG*"). Shaw Pittman accepted this proposal but inserted a new condition, stating "I will not be fighting with CHG about my fee applications (trust me, not that I am concerned; and I am sure you probably know, any fights about fee applications would be an expense to be paid by CHG)." *Id.* at 353 n.6. CHG responded "It's a deal," and then added another condition concerning discounts to Shaw Pittman's proposed fees. *Id.* at 353 n.7. The final email from Shaw Pittman rejected the proposed discount, and requested confirmation that all of the firm's fees would be paid. *Id.* at 353 n.8. Following this exchange, CHG appeared before the bankruptcy court and requested confirmation of a reorganization plan that incorporated the two-step payment structure envisioned in the emails.

Shortly thereafter, Shaw Pittman filed two fee applications for services rendered during the bankruptcy proceedings, Stmt. of Facts ¶ 6, and CHG—having apparently forgotten the Fee Agreement—filed various objections to those fee applications. R. at 111.[3] In particular, CHG

---

[3] Citations to "R. at __" throughout this opinion refer to the adjudicative record filed with this Court at the inception of this appeal. *See generally* Bankruptcy Record, Jan. 10, 2011 [2].

objected to "the totality of fees billed by Shaw Pittman," and raised several concerns at subsequent hearings before Judge Teel. *Id.* Relying on the Fee Agreement, Judge Teel overruled CHG's objections, and on April 20, 2004 issued an order entitling Shaw Pittman to collect the fees and expenses that accrued prior to December 15, 2003. App. at 278.[4] This order was joined with several others and appealed to this Court. Stmt. of Facts ¶ 8.

On appeal, this Court held that when CHG declared "it's a deal" in response to Shaw Pitman's request that it not fight with the firm about fee applications, CHG did in fact waive its right to object to those fee applications. As this Court explained: "the emails unambiguously show the that final email from Shaw Pittman served to clarify the terms of [its prior email] as not including any . . . discount and requesting confirmation from CHG . . . . CHG's failure to respond show that at the conclusion of the emails, Shaw Pittman had extended an offer to CHG but CHG had not accepted that offer." *In re CHG*, 313 B.R. at 353. This Court then observed that the law required CHG to represent to the bankruptcy court—when requesting approval of its reorganization plan—that its administrative creditors (including Shaw Pittman) had been paid in full or had otherwise agreed not to receive full payment at the time of confirmation. It therefore held that by incorporating the payment schedule from the email exchange into the confirmation plan and not otherwise informing the bankruptcy court that Shaw Pittman had not been fully paid, CHG had accepted the Fee Agreement through its own actions and silence. *Id.* at 354–55. That Agreement included a "term prohibiting objections to Shaw Pittman's fee applications" and a provision which "required CHG to pay Shaw Pittman's expenses in the event that CHG attempted to object to any of Shaw Pittman's fee applications." *Id.* at 354 & 357. Based on these provisions, the case was remanded to the bankruptcy court to execute the prior fee award

[4] Citations to "App. at __" throughout this opinion refer to the appendix filed by Shaw Pittman with this Court as part of its initial briefing. *See generally* Exs. 1–16 to Appellant's Brief, Feb. 7, 2011 [10]. The pages of this appendix are stamped "SP - - - -," and the Court uses these stamps for page references.

and to calculate Shaw Pittman's costs in defending against CHG's objections—including the costs of the appeal—and enter an award for those expenses. *Id*. at 358.

Following the appeal, the bankruptcy court entered a series of orders concerning payment of Shaw Pittman's fees. First, on December 1, 2004, Judge Teel granted Shaw Pittman's motion for attorneys' fees and ordered CHG to compensate Shaw Pittman for, *inter alia*, "fee application litigation fees and expenses" which it incurred during its defense of its initial fee application. App. at 368. That order referenced an earlier hearing, at which Judge Teel explained:

> [CHG] and Shaw Pittman had entered into a contract that there would be no objections to Shaw Pittman's fee applications. And Shaw Pittman was entitled to enforce that contract. It was entitled to avoid any litigation by way of objection by [CHG] to its fee applications. Shaw Pittman, as a matter of right, stood up for its contractual right not to have any objections made to its fee application and pursued that contractual right. And in doing so, it incurred attorneys' fees and expenses. . . . And as I've already said, the reason the fees were so high was because [CHG] continued to defend against the contract's existence, raising often frivolous legal arguments, injecting factual questions into the proceeding that were stumbling blocks to a rapid disposition of the dispute.

*Id*. at 324–25. The bankruptcy court subsequently entered three additional orders granting Shaw Pittman's later fee applications. *Id*. at 422–27.

### 2. The Zoning Appeal

Prior to these fee disputes and throughout the bankruptcy proceedings, Shaw Pittman acted as counsel for CHG in several capacities, one of which was the representation of an affiliated entity—Capitol Hill Healthcare Corporation (the "Nursing Center")—in a zoning dispute. *Id*. at 760. Under the Certificates of Occupancy granted to the Nursing Center by the D.C. Zoning Administrator, CHG was obligated to maintain a 1:5 ratio between the number of parking spots it provided for the Center and the number of beds in the facility. *Id*. at 762. This ratio permitted CHG to operate the Nursing Center while maintaining only 25 parking spots. On

March 26, 2003 the Zoning Administrator issued new Certificates to the Nursing Center that maintained the 1:5 ratio rather than—as had been proposed—instituting a 1:1 ratio between parking spots and beds. *Id*. Shortly thereafter, a neighborhood association appealed to the D.C. Board of Zoning Adjustment ("BZA") requesting that it reverse the Administrator's decision and amend the Nursing Center's Certificates to mandate a 1:1 ratio (the "BZA Appeal"). *Id*. at 762.

Shaw Pittman represented the Nursing Center throughout the BZA Appeal, *id*. at 760, until it moved before the bankruptcy court to withdraw as CHG's counsel on the first day of 2004. *Id*. at 763. Six days later—before the bankruptcy court had acted on Shaw Pittman's motion—the BZA orally ruled in favor of the Nursing Center and affirmed the Administrator's issuance of Certificates that included only a 1:5 ratio. *Id*. One day later, the bankruptcy court granted Shaw Pittman's motion and the firm withdrew from its representation of CHG, informing CHG that Shaw Pittman would cease to represent the Nursing Center in the BZA Appeal. *Id*.[5] However, Shaw Pittman never informed the BZA that it had withdrawn as counsel to the Nursing Center. *Id*. Nearly two months later—well after Shaw Pitman's withdrawal—the BZA *sua sponte* and without prior warning reversed course and in a written opinion voted to reform the Nursing Center's Certificates to reflect a 1:1 ratio of parking spots to beds. *Id*. The only representative of CHG that was served with the BZA's revised opinion was an attorney at Shaw Pittman. *Id*. at 782. Shaw Pittman, however, did not pass on the BZA's ruling at the time, and CHG only learned of the written opinion from a third party in March of 2005—nearly six months after the BZA's decision and well beyond the time for any appeal by CHG. *Id*. at 764.

---

[5] One point of contention before the bankruptcy court in this adversary proceeding was whether Shaw Pittman's actions—which CHG alleged were substandard—occurred after December 15, 2003 and thus would not be subject to the terms of the Fee Agreement. Brief of Appellee Capitol Hill Group 10–11, Mar. 8, 2011 [11] ("CHG Br."). This question is critical, according to CHG, because if those acts are not subject to the Fee Agreement, Shaw Pittman cannot use the Agreement to seek fees here. *Id*. However, because the Court holds that Shaw Pittman cannot seek *any* reimbursement under the Fee Agreement—regardless of when the acts in question occurred—the Court does not concern itself with the particular timing of the relevant events in the BZA Appeal.

## B. The Malpractice Action

Subsequent to both the Fee Agreement and the BZA Appeal, quarrels between CHG and Shaw Pittman continued for almost two more years. Clearly not having had enough in the bankruptcy proceeding, CHG decided to expand the dispute and bring the fight to a new forum—Superior Court. In a new complaint, CHG asserted that Shaw Pittman committed malpractice and breached both its fiduciary duties to, and its engagement contract with, CHG through substandard representation of the Nursing Center during the BZA Appeal (the "malpractice claim"). *See generally id*. at 452–60. In particular, CHG alleged that Shaw Pittman failed to raise certain arguments concerning historical designations which may have shielded CHG from the BZA's adverse opinion, and then waived CHG's right to appeal by failing to promptly notify CHG of the BZA's second decision. *Id*. at 456–57. In light of these missteps, CHG sought $50 million in damages from economic losses caused by the BZA's adverse decision. *Id*. at 457.

Shaw Pittman removed CHG's suit to this Court and argued that the malpractice claim arose out of the bankruptcy dispute and should be dismissed under the doctrine of *res judicata*. In a September 2008 opinion, this Court agreed and dismissed CHG's complaint. *Capitol Hill Grp. v. Pillsbury Winthrop Shaw Pittman, LLP*, 574 F. Supp. 2d 143, 153 (D.D.C. 2008) ("*Capitol Hill I*"). Specifically, this Court held that the malpractice claim was precluded because it involved the same facts and circumstances as the prior bankruptcy disputes and thus could have been raised in that proceeding. *Id*. at 149–51. On appeal, the D.C. Circuit observed that Judge Teel had been in a position to evaluate the malpractice allegations and affirmed, holding that "fee litigation in the bankruptcy proceeding preclude[s] later malpractice claims against the bankruptcy professionals to which the fees had been awarded." *Capitol Hill Grp v. Pillsbury, Winthrop, Shaw, Pittman LLC*, 596 F.3d 485, 490–91 (D.C. Cir. 2009) ("*Capitol Hill II*").

## C.     This Adversary Proceeding

Not wanting to be outdone by CHG's latest offensive in the parties' feud, Shaw Pittman played Hatfield to CHG's McCoy and struck back by returning to the bankruptcy court to institute yet another adversary proceeding.  R. at 1–3.  The gravamen of Shaw Pittman's complaint is that CHG's malpractice claim is a breach of the parties' original Fee Agreement.  *Id*. at 3.  A few months into this latest melee, Shaw Pittman moved for summary judgment, arguing that "CHG [is] legally obligated to further compensate Shaw Pittman for the fees and expenses incurred in defending against challenges by CHG to the services rendered by Shaw Pittman."  *Id*. at 106.  CHG returned fire, objecting that Shaw Pittman over-reads a Fee Agreement that, by its own terms, extends to disputes over fee applications and not to separate claims concerning the quality of the services provided by Shaw Pittman.  *Id*. at 197–200.

In the opinion below, Judge Teel sided with CHG and held that the Fee Agreement could not serve as a basis for recovering expenses incurred by Shaw Pittman in defending against CHG's malpractice claim.  *See generally* Memorandum Decision re Plaintiff's Motion for Summary Judgment, R. at 526 ("Bk. Op.").  As Judge Teel explained, the Fee Agreement prohibited CHG "from objecting to the pertinent fee applications on any ground, including based on any alleged defect in Shaw Pittman's services," but did not "attempt to address whether [CHG] was barred from seeking damages against Shaw Pittman for harm caused by any malpractice."  Bk. Op. at 12.  Thus, because the Fee Agreement "did not purport to release Shaw Pittman from all claims that [CHG] might have against it," *id*. at 14, it does not govern the malpractice claim in which CHG "did not allege harm in the form of fees paid to Shaw Pittman [but instead] alleged harm of an entirely different character, namely, substantial damages arising from the BZA's imposition of a requirement regarding parking spaces that adversely affected the

operations of [CHG]." *Id*. at 16–17. The bankruptcy court then instructed Shaw Pittman to explain why summary judgment against it should not be entered. R. at 554–555. After Shaw Pittman's failed attempt to re-hash its earlier arguments, *id*. at 592–93, summary judgment was entered on behalf of CHG. *Id*. at 595. Shaw Pittman, predictably, appeals.

## III.     STANDARD OF REVIEW

A decision on summary judgment by the bankruptcy court is reviewed *de novo* by the district court. *United States v. Spicer*, 57 F.3d 1152, 1159 (D.C. Cir. 1995). This *de novo* review includes both the bankruptcy court's findings of fact and conclusions of law. *Id*. Summary judgment in bankruptcy proceedings is governed by Bankruptcy Rule 7056, which incorporates the standards found in Rule 56 of the Federal Rules of Civil Procedure. For a court to grant dismissal under Rule 56, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Doe v. IRS*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009) (citing *Anderson*, 477 U.S. at 248). Here, the relevant and material facts are largely undisputed, and the resolution of this matter depends entirely upon the proper interpretation of the Fee Agreement.

## IV.     ANALYSIS

Federal and state courts traditionally employ the so-called "American rule" in which litigants pay their own attorneys' fees, regardless of who wins and who loses, *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 256 (1975), and the District of Columbia—whose law governs this dispute—adheres to this practice. *See Oliver T. Carr Co. v. United Techs.*

*Commc'ns Co.*, 604 A.2d 881, 883 (D.C. 1992) ("[T]his jurisdiction follows the American Rule under which every party to a case shoulders its own attorneys' fees . . . .") (quotations omitted). However, certain limited exceptions to the American rule exist; for example, a party may be entitled to collect attorneys' fees from the losing side by operation of statute or by contractual agreement. *Petrochem Insulation, Inc. v. NLRB*, 240 F.3d 26, 35 (D.C. Cir. 2001). In other circumstances, an award of attorneys' fees may be warranted when one side acted in bad faith by, for example, engaging in conduct sanctionable under Rule 11. *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 187 F.3d 655, 659 (D.C. Cir. 1999). Here, Shaw Pittman relies upon two exceptions: first, it argues that the Fee Agreement struck between the parties extends to CHG's malpractice suit and thus requires CHG to reimburse Shaw Pittman for the cost of defending against that action; second, Shaw Pittman contends that CHG acted in bad faith by bringing a malpractice suit outside of the bankruptcy proceeding, and thus attorneys' fees are warranted. The Court addresses each of these arguments in turn.

### A.      The Fee Agreement is Inapplicable Here

The Court first turns to Shaw Pittman's primary contention on appeal: that the Fee Agreement, under which CHG agreed not to fight with Shaw Pittman about its fee applications, extends to the malpractice claim brought by CHG outside of the bankruptcy proceedings and thus obligates CHG to reimburse Shaw Pittman for the costs of defending itself against that claim. SP Br. 13–17. Though overburdened with many levels of unnecessary complexity—an unavoidable consequence of briefings by embittered and entrenched parties that have been engaged in protracted and hostile litigation for nearly a decade—this issue is reducible to a genuinely simple question: Was the malpractice claim a fight about fees as envisioned in the Agreement? For the reasons set forth below, the Court finds that it was not.

### 1. The Scope of the Fee Agreement

"Interpretation of a contract, like statutory and treaty interpretation, must begin with the plain meaning of the language." *AFGE, Local 2924 v. FLRA*, 470 F.3d 375, 381 (D.C. Cir. 2006). The task of the Court in interpreting any contract—including the Fee Agreement here—is to give effect to the parties' intent, and where the language of the particular agreement or provision is clear and unambiguous, the Court must assume that the meaning ordinarily ascribed to the words used reflects the intentions of the parties. *Pigford v. Schafer*, 536 F. Supp. 2d 1, 10 (D.D.C. 2008) (citing *Mesa Air Group, Inc v. Dep't of Transp.*, 87 F.3d 498, 503 (D.C. Cir. 1996)). The Court will therefore not rely upon extrinsic evidence outside the language of the contract unless the meaning of that particular agreement is facially uncertain. *Nofziger Commc'ns v. Birks*, 989 F.2d 1227, 1230 (D.C. Cir. 1993).

The primary effect of the Fee Agreement is to bar CHG from disputing Shaw Pittman's fee applications in the bankruptcy proceeding. *See supra* Section II.A.1. The relevant provision reads: "[Shaw Pittman] will not be fighting with CHG about [its] fee applications (trust me, not that [Shaw Pittman is] concerned; and [Shaw Pittman is] sure [CHG] probably knows, any fights about fee applications would be an expense to be paid by CHG)." *In re CHG*, 313 B.R. at 353 n.6 (quoting email exchange between counsel for Shaw Pittman and counsel for CHG). The plain and clear meaning of this provision has been previously summarized by this Court: "CHG cannot fight with Shaw Pittman over its fee applications." *Id.* at 352; *see also id.* (finding clear meaning of Fee Agreement to be "that CHG would not contest Shaw Pittman's fee applications for fees billed up to that point"). Nothing in the text of the Fee Agreement, however, purports to waive any substantive rights of CHG *beyond* its right to dispute Shaw Pittman's fee applications. Thus, for example, if CHG were to learn tomorrow that Shaw Pittman, during the course of its

representation, had divulged CHG's trade secrets to a competitor, nothing in the text of the Agreement would bar CHG from seeking damages for any harm suffered as a result of that improper disclosure. In other words, though it failed spectacularly, the Fee Agreement does in fact have a specific, limited purpose: to ensure that Shaw Pittman could collect its fees in the bankruptcy proceeding without significant objection or protracted litigation.

In arguing that the Fee Agreement should be understood more broadly, Shaw Pittman places significant emphasis on the term "fight" in the relevant provision. According to Shaw Pittman, the term "fight" encompasses any and all disputes related to, or that might otherwise affect, Shaw Pittman's ability to collect its fees. Following this line of thinking, Shaw Pittman concludes that CHG's malpractice suit "was a direct challenge to the services covered by the [Fee Agreement] and for which Shaw Pittman sought compensation in its fee applications. It was as much a fight over Shaw Pittman's fee applications as were CHG's prior objections and other contests." Brief of Appellant Pillsbury Winthrop Shaw Pittman LLP 14, Feb. 7, 2011 [10] ("SP Br."). On some level, Shaw Pittman is correct that "fight" reaches beyond formal objections to Shaw Pittman's fee applications within the bankruptcy proceeding and captures other types of disputes over the firm's fees. Thus, for example, if CHG had brought a separate civil suit seeking return of some fees it had paid to Shaw Pittman on the ground that the firm had double-billed CHG, the Court would have little trouble concluding that such a dispute would be subject to the Fee Agreement. The Court therefore agrees with Shaw Pittman that "fight" covers various *forms* of actions beyond a formal objection in the bankruptcy proceedings.

The Court cannot, however, accept the second step of Shaw Pittman's reasoning, which improperly stretches the Fee Agreement beyond its plain language to conclude that the Agreement applies to other *subjects* beyond Shaw Pittman's fees. As an initial matter, Shaw

Pittman improperly conflates a claim of harm derived from the services it provided with a dispute over its fees. Nothing in the Fee Agreement addresses the quality of Shaw Pittman's services, or purports to waive CHG's right to seek compensation for other harms—beyond the payment of those fees—caused by such services. *See* Bk. Op. at 12 ("[T]he agreement did not attempt to address whether [CHG] was barred from seeking damages against Shaw Pittman for harm caused by any malpractice Shaw Pittman committed in the rendition of those services."). Had Shaw Pittman desired a waiver of all claims that CHG might have had against it, it could have sought such a waiver from CHG.[6] It did not, however, and the Court will not now extend the limited obligation found in the email exchange between the parties into a broader waiver of substantive rights. Moreover, Shaw Pittman's suggestion that the term "fight" expands the subjects covered by the Fee Agreement ignores the plain language of the relevant provision, in which "fight" is limited by the modifying clause which follows: *about Shaw Pittman's fee applications*. Even adopting Shaw Pittman's proposed definition of "fight" as an "attempt to prevent the success or effectiveness of," SP Br. at 14 (quotations omitted), read in this context, the Fee Agreement extends only to attempts to prevent the success of Shaw Pittman's collection of fees—not attempts to seek compensation for other harms caused by Shaw Pittman's services. Finally, as the term is commonly understood, a person only "attempts" that which he has the specific intent to accomplish. *United States v. Duran*, 884 F. Supp. 577, 582 (D.D.C. 1995) (citing *Braxton v. United States*, 500 U.S. 344, 349 (1991)). In other words, where a party undertakes a particular act that has an incidental effect, it cannot be said that the party intended

---

[6] Indeed, near the end of the bankruptcy proceedings, and prior to the malpractice suit, Shaw Pittman sought assurances from the bankruptcy court that CHG would not bring any new claims against it. App. at 434–35. In addressing these concerns, Judge Teel noted that any objection to Shaw Pittman's services would be barred by *res judicata*, *id.* at 435–36, and informed Shaw Pittman that "[i]f [CHG] were to pursue claims against you after this adversary proceeding is dismissed, you've got the defense of *res judicata*, you can file your Rule 11 motion, file a motion to extend the time to answer, and if they don't dismiss in the face of a valid defense of *res judicata*, then you're back in the sanctions business." *Id.* at 436. Notably, while Judge Teel indicated that Shaw Pittman might seek sanctions in any separate dispute, he did not suggest that such a suit would be barred by the Fee Agreement.

to accomplish—or attempted—that effect. The Court therefore does not read the language of the Fee Agreement as extending to actions taken by CHG which might have the incidental effect of undermining Shaw Pittman's pursuit of its fees but which were not so intended.

In sum, the language of the Fee Agreement plainly bars CHG from raising direct challenges to Shaw Pittman's collection of fees arising out of the bankruptcy proceedings, but cannot fairly be read to shelter Shaw Pittman from any separate actions by CHG that might have an effect on the fee applications but are not specifically intended to overturn them.[7] This reading of the Agreement is consistent with its prior application, which has only been in the context of direct challenges to Shaw Pittman's fee applications. *See supra* Section II.A.1. Having determined that the Fee Agreement applies only to disputes about Shaw Pittman's fees—and not to either claims regarding Shaw Pittman's services or litigation which could incidentally affect the collection of fees—the Court now turns to whether CHG's malpractice claim does in fact constitute a dispute about Shaw Pittman's fees.

### 2. The Malpractice Claim is Not a Dispute over Fees

Applying the Fee Agreement as defined above, there is no doubt that CHG's malpractice claim against Shaw Pittman does not fall within the scope of the relevant provision. As an initial matter, the suit itself does not challenge the award of fees to Shaw Pittman in the bankruptcy proceeding, nor does it seek compensation for the fees paid. Nowhere in its complaint does CHG indicate that Shaw Pittman had improperly received payment for its representation of CHG's interests during the BZA Appeal; indeed, CHG notes that Shaw Pittman received compensation for its services during the BZA Appeal and yet does not object the payment of

---

[7] Of course, as this Court previously determined, such separate actions may be precluded because of their relation to the bankruptcy proceedings, *see supra* Section II.B, but that is because of the effect such later proceedings might have on the bankruptcy court's prior judgment, and not due to the existence of the Fee Agreement. *See infra* Section IV.A.3.

those fees.  App. at 455.  Similarly, CHG does not contend that the payment of Shaw Pittman's

fees in the bankruptcy proceeding caused CHG any harm, nor does the prayer for relief in the

complaint request either the return of the fees paid to Shaw Pittman or damages for the payment

of such fees.  *See generally id.* at 459–60.

Rather than objecting to the fees paid to Shaw Pittman in the bankruptcy proceeding, the

malpractice complaint focuses on specific acts of Shaw Pittman which allegedly harmed CHG.

In particular, CHG alleges two deficiencies in Shaw Pittman's representation of CHG during the

BZA appeal: Shaw Pittman's failure to argue on appeal that certain D.C. zoning practices

concerning historic designations prohibited the BZA from imposing any additional parking

requirements on the Nursing Center, and Shaw Pittman's substantial delay in informing CHG

that the original outcome of the BZA Appeal had been reversed and was now adverse to CHG's

interests.  *Id.* at 455–57.  According to the malpractice complaint, these alleged failings on the

part of Shaw Pittman harmed CHG because they resulted in the adverse outcome of the BZA

Appeal which in turn required CHG to provide significantly more parking spots than it believed

were necessary prior to that adverse decision.  *Id.* at 455–56.  This substantial new requirement

had a negative economic impact on CHG, as it was unable to expand its operations in the area

due to the lack of available parking spaces and yet was left holding property below market value

due to the significant increase in the parking requirements.  *Id.* at 456–58.  In short, CHG's suit

in Superior Court did not challenge Shaw Pittman's previous collection of fees, nor did it request

the return of those fees; instead, the malpractice suit sought recovery for a harm—independent

from the fees paid to Shaw Pittman—that was allegedly caused by Shaw Pittman's inadequate

representation of CHG.  Such an action does not constitute a fight about Shaw Pittman's fee

applications.

This conclusion is further substantiated by the fact that neither this Court nor the D.C. Circuit relied upon the Fee Agreement in dismissing CHG's malpractice suit. If the Fee Agreement was in fact so broad as to preclude CHG's malpractice claim, such an argument would have presented a simple defense to the malpractice action and obviated the need for this Court to engage in any preclusion analysis. Yet neither court reached this conclusion, despite this Court's explicit consideration of the Fee Agreement's effect on the application of *res judicata*. *Capitol Hill I*, 574 F. Supp. 2d at 354. This is because the core purposes of the Fee Agreement was the preservation of Shaw Pittman's right to collect its fees in the bankruptcy proceeding—a bargain it received, Bk. Op. at 16—and not the prevention of suits alleging that Shaw Pittman had provided inadequate representation and therefore harmed CHG.

### 3. Principles of *Res Judicata* Do Not Alter this Analysis

Perhaps recognizing that the plain language of the Fee Agreement does not support its proposed interpretation, Shaw Pittman relies extensively on this Court's application of *res judicata* to dismiss the malpractice claim. In brief, Shaw Pittman argues that this Court's disposal of CHG's suit demonstrates that the malpractice claim is merely a re-hash of the prior fee disputes and should therefore be subject to the Fee Agreement. SP Br. at 10–14.

As an initial matter, there is no reason for the Court to look to the subsequent treatment of CHG's malpractice claim at all. As set forth above, the language of the Fee Agreement simply cannot be read as a waiver of CHG's right to bring suit alleging that Shaw Pittman was negligent or deficient in its representation of the Nursing Center and therefore caused harm to CHG through the imposition of substantially greater parking requirements. And because the plain meaning of the Fee Agreement is clear and unambiguous, this Court need not look to extrinsic evidence beyond the Fee Agreement—such as the resolution of the malpractice claim—to define

the scope of the relevant provision.  *See Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 547 (D.C. Cir. 2010) (holding that ambiguity in contract interpretation only arises "where an agreement is reasonably susceptible to different constructions or interpretations") (quotations omitted).  However, not wanting to provide fertile ground upon which the parties might prolong their feud, the Court below explains why its dismissal of the malpractice claim based on *res judicata* does not alter the proper interpretation of the Fee Agreement.

*Res judicata*, also know as claim preclusion, is a legal doctrine that bars the re-litigation of claims that were—or should have been—previously litigated.  Under the doctrine, "a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction."  *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006).  The scope of such preclusion extends not only to claims that were previously raised in a prior legal proceeding, but also to "matters that *should have been* raised in an earlier suit."  *NRDC v. EPA*, 513 F.3d 257, 261 (D.C. Cir. 2008).

A key dispute during the malpractice proceeding—and one Shaw Pittman relied upon here—was whether the first element of claim preclusion was satisfied; in other words, whether the malpractice claim involved the "same claims or causes of action" as the earlier fee disputes.  Despite speaking in terms of "claim" or "cause of action," this element is *not* concerned with the legal theories set forth in each proceeding, *see Rodriguez v. CIS*, 605 F. Supp. 2d 142, 147 (D.D.C. 2009) ("[A]n action based on the same nucleus of facts . . . is said to share the same cause of action, and therefore is barred by *res judicata*, even if the latter action is predicated on a different legal theory."); instead—as this Court explained—the central question is whether there exists an identity of issues, which occurs when "the cases are based on the same 'nucleus of

facts.'" *Capitol Hill I*, 574 F. Supp. 2d at 149 (quoting *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984)).  In the case of CHG's malpractice claims, this Court found that "all three counts . . . arose from the same nucleus of facts as the fee application disputes that were previously decided in bankruptcy court." *Id*.  Thus, "because CHG's claim for legal malpractice arises from the same facts as Shaw Pittman's claim for fees, CHG should have raised these claims during the bankruptcy fee disputes" and its failure to do so precluded it from subsequently raising those claims.  *Id*. at 149–50; *see also Rodriguez*, 605, F. Supp. 2d at 147 ("*Res judicata* bars a claim that could have been brought in a prior suit . . . but was not.").  Similarly, the D.C. Circuit affirmed this Court's application of claim preclusion after explaining that "there was an adversarial process before the bankruptcy court and the bankruptcy court was in a position to judge the quality of Shaw Pittman's services."  *Capitol Hill II*, 569 F.3d at 491.  The application of *res judicata* to the malpractice claim was therefore a necessary result of the fact that CHG could have raised its allegations in the context of the bankruptcy proceeding, *see Kelly v. NovaStar*, 637 F. Supp. 2d 34, 38 (D.D.C. 2009) ("The doctrine of *res judicata* embodies the principle 'that a party who once has had a *chance* to litigate a claim before an appropriate tribunal usually ought not to have another chance to do so.'") (quoting *SBC Commc'ns, Inc. v. FCC*, 407 F.3d 1223, 1229 (D.C. Cir. 2005)—a determination that is entirely distinct from the question of whether the malpractice claim itself constitutes a "fight" about fees.[8]

---

[8] Shaw Pittman also makes much of this Court's concern when addressing the malpractice claim that such a claim could nullify the bankruptcy court's prior holdings concerning attorneys' fees. SP Br. at 16–17.  However, the "nullification" that both this Court and the D.C. Circuit were concerned with was not the nullification of fee awards made pursuant to the Fee Agreement, but rather the nullification of Judge Teel's prior determination that Shaw Pittman had in fact provided adequate services.  *See Capitol Hill II*, 569 F.3d at 492 ("[T]he bankruptcy judge also made oral findings that Shaw Pittman's services were professional . . . . To allow CHG to litigate malpractice claims against Shaw Pittman now, based on the same representation, would nullify the initial judgment."); *see also Capitol Hill I*, 574 F. Supp. 2d at 149 (noting that "the bankruptcy court did make a finding that Shaw Pittman was entitled to fees in part because the representation it provided was competent and professional").  Thus, this Court dismissed CHG's malpractice claim not because it was another "fight" about fees, but because Judge Teel had already evaluated the quality of services performed by Shaw Pittman, *see Capitol Hill I*, 574 F. Supp. 2d at 149 ("[T]he

The absence of any discussion of the Fee Agreement in the malpractice dispute underscores this crucial distinction between (1) whether there was any factual overlap between the fee disputes and the malpractice claim and (2) whether the fee disputes and the malpractice claim are the same legal claim. Had this Court actually determined that CHG's malpractice claim was—as suggested by Shaw Pittman—part of a "scheme" to subvert the Fee Agreement and merely constituted another fee dispute in disguise, this Court could have availed itself of a much easier and more direct method for dismissing the suit—the Fee Agreement itself, which bars any dispute over fees. It did not do so, however, but instead focused on the distinction between whether a particular claim shared a common nucleus of facts with a prior claim and whether that particular claim was simply a prior allegation in another legal form. *Cf. Capitol Hill I*, 574 F. Supp. 2d at 149 ("[I]t is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies.").

Ignoring these distinctions, Shaw Pittman seizes on a passing statement by Judge Teel in his opinion that "[w]hat Shaw Pittman appears to be arguing is . . . that if the malpractice claims had been raised as an objection to the fee applications . . . the objection would have been barred by the parties' agreement . . . . That may be true." Bk. Op. at 26–27. Based on this statement, Shaw Pittman argues that Judge Teel ignored the potential effect that a judgment in favor of CHG in the malpractice action could have had upon the prior fee applications. SP Br. at 15–17. In essence, Shaw Pittman's argument is that had CHG asserted its malpractice claim in the bankruptcy proceeding it would have been treated as an objection to the fee application—thus subject to the Fee Agreement—and the fact that the malpractice claim was brought in a separate proceeding should not alter this result. *Id*. at 20–21. This argument, which relies upon Shaw

---

bankruptcy court did make a finding that Shaw Pittman was entitled to its fees in part because the representation it provided was competent and professional."), and this Court would not permit reconsideration of that evaluation.

Pittman's contention that allegations of malpractice in bankruptcy proceedings are merely defenses to fee applications, is not without force, and the Court does not treat it lightly. The fact that such allegations may sometimes be treated as defenses to fee applications, however, is inextricably tied to the bankruptcy statutes, which require that the bankruptcy judge both find that legal representation was adequate before granting a fee application, *see* 11 U.S.C. § 330(a)(3) (requiring bankruptcy court to evaluate "the nature, the extent and the value of such services" before awarding attorneys' fees), and deny fee applications where attorneys provide substandard services. *See id.* at § 330(a)(4) (declaring that "the court shall not allow compensation for . . . services that were not reasonably likely to benefit the debtor's estate"). Indeed, these provisions were explicitly relied upon in the cases cited by this Court and the D.C. Circuit in dismissing CHG's malpractice claim. *See, e.g.*, *Grausz v. Englander*, 321 F.3d 467, 473 (4th Cir. 2003) (citing § 330(a)(3) and noting that "[t]he fee application proceeding necessarily included an inquiry by the bankruptcy court into the quality of professional services rendered"); *In re Iannochino*, 242 F.3d 36, 42 (1st Cir. 2001) (citing § 330(a)(4) and explaining that "[u]nder the relevant section of the bankruptcy code governing fee awards, a finding of malpractice would mean that the attorneys were not entitled to compensation for those services found to be substandard"); *Osherow v. Ernst & Young, LLP*, 200 F.3d 382, 387 (5th Cir. 2000) (same).[9] These provisions of the bankruptcy code, however, cannot alter the clear language of the Fee Agreement, nor do they apply outside of the bankruptcy proceeding. In other words, the fact that a malpractice claim might operate under the bankruptcy laws as a defense to a fee

---

[9] The other cases cited by Shaw Pittman for the principle that a malpractice claim is a defense to a claim for attorneys' fees all involve cases in which a lawyer initially brought suit seeking payment, and the former client subsequently asserted a claim for malpractice. *See Hendry v. Pelland*, 73 F.3d 397, 403 (D.C. Cir. 1996) (discussing use of malpractice claims "as a defense to [a] counterclaim"); *Law Offices of Jerris Leonard, P.C. v. Mideast Sys., Ltd.*, 111 F.R.D. 359, 361 (D.D.C. 1986) ("[I]t is hard to imagine a clearer compulsory counterclaim to a complaint for failure to pay legal fees than a legal malpractice claim."). None of these cases, however, support the proposition that a former client who brings a suit for malpractice seeking damages for harms *unrelated* to the payment of the attorney's fees does not assert an independent cause of action but merely a "defense" to attorneys' fees.

application does not transform an independent claim for harms unrelated to the payment of attorneys' fees into a re-hash of the fee dispute. In applying the doctrine of *res judicata* to bar CHG's malpractice claim, this Court found that (1) the factual question of the quality of Shaw Pittman's services was before the bankruptcy court, (2) the bankruptcy court did in fact consider the quality of Shaw Pittman's services, and thus (3) CHG could have raised the malpractice claim before the bankruptcy court's final opinion. This Court did not, however, find that the malpractice claim was merely an attempt to re-litigate the earlier fee disputes, and thus this Court's holding says nothing as to the proper interpretation of the Fee Agreement.

Indeed, it is not at all clear from the language of the Fee Agreement that—had CHG pursued its malpractice claim in the bankruptcy proceedings and been able to demonstrate that it was affirmatively harmed by Shaw Pittman's failures in the proceedings—CHG either would have either been (1) required to compensate Shaw Pittman for litigating this issue or (2) barred from recovering damages based on its alleged harms. Had CHG prevailed, the Court sees nothing in the Fee Agreement that would have prohibited CHG from successfully collecting damages from Shaw Pittman based on the harms it suffered as a result of the adverse outcome of the BZA Appeal. There is thus no basis upon which this Court can conclude that CHG's malpractice claim constitutes a "fight" about Shaw Pittman's fees, and it therefore affirms Judge Teel's determination that the expenses incurred by Shaw Pittman in defending against the malpractice claim are not subject to reimbursement by CHG pursuant to the Fee Agreement.

### B.     Shaw Pittman Has Not Established CHG's Bad Faith

In addition to relying upon the plain language of the Fee Agreement, Shaw Pittman also briefly contends that CHG acted in bad faith by bringing the malpractice claims outside of the bankruptcy proceeding. As explained by Shaw Pittman: "CHG's entire course of conduct with

respect to Shaw Pittman's fees since January 30, 2004 has been aimed at depriving Shaw Pittman of the fruits of the [Fee Agreement]." SP Br. at 23. Shaw Pittman contends that these actions— including the malpractice claim—constitute a breach of the duty of good faith implied by D.C. law into every agreement—including the Fee Agreement here. *Id.* This argument fails for two reasons. First, it is "a black letter principle of appellate review" that issues and theories not asserted in the lower court are "waived and will not be heard for the first time on appeal." *In re CHG*, 313 B.R. at 350 (citing *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984)). Here, Shaw Pittman raises for the first time on appeal the doctrine of an implied duty of good faith found in D.C. law, and so the Court will not rely upon it here. Second, putting aside the legal issue of waiver, the simple fact remains that on a motion for summary judgment, Shaw Pittman has not adduced a single piece of evidence—save its own speculation and innuendo—to establish that CHG brought the malpractice claim for any purpose other than to collect damages it had suffered as a result of the BZA Appeal. *See supra* Section IV.A.2. Indeed, Shaw Pittman acknowledges as much in its reply briefing where it asks the Court to remand this matter to the bankruptcy court to resolve the "classic issue of fact" as to whether CHG violated the implied duty. Reply Brief of Appellant, Mar. 22, 2011 [12]. Given Shaw Pittman's utter failure to raise this issue when it had the opportunity, the Court is not inclined to extend the parties' melee in light of its clear waiver of the issue and the complete absence of available evidence as to CHG's intent.

## V. CONCLUSION

Shaw Pittman and CHG have now been embroiled in disputes over fees and services arising from the Chapter 11 proceedings for nearly a decade. Though it would like to believe that today's opinion might lead to final resolution of this long-running feud, the Court holds no

illusion that it possesses the power to pacify these parties. As precedent, this matter is less likely to be recognized for the articulation of any particular principle than as an illustration of two legal truisms: first, that no opponent is ever as dedicated or persistent a foe as one that feels aggrieved by its former lawyers; and second, that the primary effect of an agreement to reimburse attorneys for litigation concerning their fees will be to incentivize litigation concerning their fees. In this case, these two circumstances have intermingled to form a volatile mix in which embittered parties, now entrenched in their own views, continue to attack each other long after the costs of doing so have exceeded the benefit to be gained. This Court now joins Judge Teel's call for the parties to put aside their past differences and bring an end to this matter.

For the reasons set forth above, it is hereby

ORDERED that Judge Teel's Order Denying Plaintiff Pillsbury Winthrop Shaw Pittman's Motion to Reconsider and Entering Summary Judgment Against Shaw Pittman, as supported by the September 14, 2010 Memorandum Decision re Plaintiff's Motion for Summary Judgment and the November 17, 2010 Memorandum Decision re Plaintiff's Motion to Reconsider, is AFFIRMED; it is furthermore

ORDERED that the parties shall bear responsibility for their own fees and expenses in the adversary proceeding and this appeal; it is furthermore

ORDERED that this appeal is DISMISSED.

SO ORDERED.

Signed by Royce C. Lamberth, Chief Judge, on April 19, 2011.